I'm sorry. Back up. I think it's Mechling vs. Mechling. It's Mechling. Good morning. And whether the court likes it or not, I'm Mechling. They're treating you with gusto. Last time I was here, you called me a wimp, so I figured I'd put a payback as appropriate. You know, we haven't ruled here yet, Mr. Weinberg. I'd like to reserve three minutes for rebuttal. I, with Amy Dinello, represent Lorenzo Johnson. This case calls for the application of the Jackson vs. Virginia standard through the epiprism of unreasonable application, whereby the court must take all of the Commonwealth's facts as true, afford the Commonwealth all reasonable inferences, and even doing that, I would submit this conviction is based on nothing more than speculation. You know, since you started off with the standard of review, I see the state dropped on you a 28-J letter yesterday. Do you have a response to that? Which aspect? They raised several points. Well, I mean, they dealt with the standard under AEDPA. Oh, yes. And, in fact, there's a couple of Supreme Court cases under AEDPA. Well, there's actually one case, McDaniel v. Brown, that's before the court. In that case, the Ninth Circuit did exactly what Jackson says not to do. It discounted evidence before the trial court, relied on an extra record declaration that was submitted only in habeas, and based on that, discounting of the trial court evidence, DNA evidence, said the evidence was insufficient. That is clearly well beyond what Jackson, frankly, I'm astounded it even happened. I think when you look at the brief submitted by the petitioner in that case, what you'll see is that they're not asking for any alteration of the AEDPA standard of review of a Jackson claim. They're simply seeking enforcement of Jackson through AEDPA. I mean, it wouldn't be the end of the world if the court waited for that. Mr. Johnson has spent 15 years in jail. Based on what I would submit is grossly insufficient evidence, and while we wouldn't mind if we had to wait four extra months, I don't think it's necessary to do so. The standard of review here, first of all, Mr. Johnson was convicted as an accomplice, and the case is wholly circumstantial. He's not the shooter. Was he ever charged substantively with the offense of first-degree murder? It was only conspiracy and aiding and abetting. His charge? Well, he was charged with first-degree murder. Via the accomplice liability? Yes, but it was purely on an accomplice liability theory. He was charged and convicted on the substantive offense of criminal conspiracy. There was no allegation of or no effort to show conspiratorial liability as it is in the case of murder. So it's a substantive first-degree murder conviction, and it's a conviction of criminal conspiracy. Now the debt, there's some back and forth in the briefs about whether this debt was a debt that Williams owed to Walker or who Williams owed this debt to. Yeah. From reading your brief, I thought the evidence was pretty clear that Williams owed the debt to Walker, and then your colleague makes the argument that, no, it was a joint debt owed to Elise Walker and your client, and perhaps to Carla Brown also. Yeah, several responses as to that. First of all, the state trial court found as a fact that the debt was owed to Walker, and in this age of the deference, I like my deference on that point, that the debt was owed to Walker alone. The district attorney argued that the debt was owed only to Walker. In your Kaminsky opinion, Your Honor, you relied on arguments made by the prosecution as to what was really going on in the case. But that was different, though, because there the prosecution was relying, at trial at least, on a really far-out theory of murder and basically conceded there's no evidence that this guy killed him. These cases are all different. These are all very factually intensive inquiries. All I'm suggesting is that if the prosecutor stands in front of the jury and says the debt is owed to Walker, it's not reasonable for the jury then to conclude that the debt is owed to my client. Are you saying the state trial court made a finding of fact? Yes. If you look at the post-verdict opinion, the finding is rather clear. The jury is told, though, that what the attorneys say is not evidence they have to rely upon. Oh, clearly. I'm not relying on that solely. Why couldn't they conclude that the debt was joint even though the attorney argues contrary? It's total speculation. Your Honor, I was going to get to a very careful review of the primary factual points. Okay. I just think a word about the evidentiary standard is appropriate here. Jackson says that the Commonwealth is entitled to all reasonable inferences. Pennsylvania law, and this is at my initial brief at page 20, Commonwealth v. McFarland, an inference is reasonable only if, quote, the fact is more likely than not to flow from the proven fact upon which it depends. Commonwealth v. Wojak, quote, the more likely than not test must be viewed as a minimum standard in assessing the reasonableness of an inference. Commonwealth v. Bailey, evidence is insufficient when based on an inference that, quote, just as reasonably has an innocent explanation. So Pennsylvania law, Pennsylvania law of evidence is what governs here. The 28J letter, the late breaking one, also makes a couple of points about Teague and retroactivity. I'm not relying on any federal authority for this. I'm relying on state evidentiary law, which this court in Jackson v. Byrd, 105 F. 3rd, 145 at page 148 through 49, quote, federal courts and habeas look to the evidence that the state considers adequate to meet the elements of a crime governed by state law. So this court, Judge Greenberg, applied state evidentiary law to a Jackson sufficiency of the evidence setting. So you're bound in evaluating the reasonableness of these inferences by looking at Pennsylvania law more likely than not. It's only logical. In Kaminsky, you talk about inferences must be logical, rational, convincing. There's no Teague issue there. The attorney general suggests that it's a new rule that convictions are insufficient if they rely on illogical, irrational, and unconvincing evidence. I don't think so. This is not a Teague situation. Looking at the facts through that evidentiary prism, and I think if you go chronologically, you look at all the things that my opponent relies on, the state court relied on, and that Judge Jones relied on in the district court, you'll see, I think, that these facts fall short. First, you have association, right? They knew each other quite well. Well, what does that mean? Does that association, they ran the streets together, lead to? Now, then you're talking about Johnson knowing Williams well? Johnson and Walker. And Walker and Williams. The shooter, right? So they're associates. They ran the streets. That does not lead, more likely than not, to the conclusion that Johnson had specific intent to kill. Knowledge of the offense, which relies on multiple inferences that have to be drawn. This all goes to the fight in front of the Kentucky Fried Chicken where Walker said, I'm going to kill that guy because he just got beat up by him. First of all, how many times did people say something like, I'm going to kill somebody, don't really mean it. You may not believe this, I haven't heard that phrase tossed about lately, at least down the streets. Well, you're a federal judge. I don't know if you should be directing that to us. I hear it all the time. Okay. That's not because people think you're a wimp, I assume. No. But what you're doing, I understand what you're doing in terms of each individual thing, and it's not unpersuasive, but the jury is entitled to take each one of those individual things, look at it collectively, and then conclude, maybe not each one, but all these things together convince me beyond a reasonable doubt that there's a significant chance. But the web can't be composed of things that each have multiple innocent inferences. So I'm getting to the point about the fight and knowledge. Would you agree, let's take a series of 15 explanations. For each one, there's an innocent explanation and a guilty explanation that are equally likely. But you get to the end where you look at all 15, and couldn't you conclude that for each individual thing, it's equally possible that it's innocent. But when you put all those things together, the likelihood of each one being innocent is more than I can say. It's like flipping a coin. If you flip a coin 100 times and it's always come up heads, the 101st time it's equally likely to come up heads, but most people would say, my guess is it's going to be Charles this time. But that's not the standard. The standard here is to do the collective inferences to be drawn from these proven facts have multiple innocent interpretations. And that's why I think it's important to look at each of the proven facts. So you have, you know, what does the debt mean? If you assume the debt means something, it means my client was owed a debt, which he may not have been. You have to assume that he was angry enough about the debt to want to do something. You have to assume that something was to kill as opposed to maybe threaten or negotiate. So there's all these multiple inferences, and the same set of multiple inferences applies to each of these proven facts. But yet a jury was convinced about it, though. I mean, I'm not sure that the standard, as you set it forth, is exactly right. The more likely than not? Well, all right. That's the sufficiency standard. If you don't apply that standard, what Pennsylvania law says is you have speculation. And that's what the jury did here. Look, people could look at this case. These are a bunch of drug dealers running around and people hanging out at bars at 2 in the morning, and people may want to just throw their hands up and say, well, who really cares? They must have been up to some no good. There was an argument. There was a fight. There was this and that. But that's not what juries are supposed to do, and that's not what this court's supposed to do. This court has an obligation under the Due Process Clause to evaluate whether these collective proven facts lead to a rational, logical, and convincing set of inferences that are more likely than not. I'm chewing into my time. If I could indulge the court for a few more minutes. The proof of that pudding, I think, is if you look at our brief at pages 31 through 34, our initial brief, we have three cases that we discuss, Pennsylvania Supreme Court insufficiency cases, where the evidence is at least as convincing as the evidence is here. In particular, you have the McFadden case, which was decided by the Pennsylvania Supreme Court. You have a man who drove the shooter in his car with the murder weapon in his car after the shooter had tried to kill the victim earlier. And arguably opens the trunk and gives him the weapon. Yeah, he opens the trunk. He goes at it. He gets something. He comes back. My client has nothing even approaching that. And the Pennsylvania Supreme Court said, such conclusions of guilt depend too much on conjecture, and a criminal conviction based wholly on inference, suspicion, and conjecture may not stand. You look at Vining. You have a case there where, you know, the accomplice is right there with the shooter. He may have asked the question, are you from 29, meaning a location. They run away together. The accomplice is... Finding in fields. He said finding in fields. I'm sorry, that's fields. You're right. Vining is the abuse case. Thank you. You're more on top of this than I am. I doubt that. But, you know, you have them running away and possibly secreting the weapon. And, you know, you have nothing close to that here from my client. You know, I don't want to speak to my opponent, you know, although I'd be happy to afterwards, but I would ask the court to ask him, what set of facts lead more likely than not, even in combination? What set of facts put together don't lead to multiple other possible explanations of innocence? He can't do it. He didn't do it in his brief. He didn't do it in the district court. And while Judge Jones did a very thorough and careful and detailed analysis, you know, I respectfully would submit he missed this point. You can't just have a series of innocent acts with multiple innocent inferences and put that all together and say, well, he must have been guilty because he was out on the street in the middle of the night up to no good. And that's what happened here. This is a real travesty. This is 15 years of this man's life for, you know, bupkis, you know. It's a Latin term, I think. I've used up all my time to list the points and questions. Nothing else? I would like to reserve my rebuttal. Okay. I reserve three minutes. Okay. That's fine. That's fine. Did your adversary get the standard right? I'm sorry, Your Honor. Did your adversary get the standard right? Absolutely not. Your Honor. Could you tell us why? Tell us your name first. Yes. Sorry. May it please the Court. My name is Will Stoikos. I represent the appellees, and if I may, I'll refer to them as the prosecution in this case. I might note this is my first appearance before this Court, and I certainly regard it as a high honor to be here. Well, let us know how we do when you're done. I wouldn't presume to do that. All right. To respond to Your Honor's question, the standard. Your Honor, I am just thrilled to hear the argument made by my opponent today, who I respect greatly. But he has made it so simple for the Court. He's got the standard completely wrong. The EdPA standard or the standard under Pennsylvania law? He's got several points of law completely wrong, and if I may, I'll address them. First of all, he's arguing to this Court that you must review under EdPA state court application of state law. That is well beyond the scope of this Court's jurisdiction and role under the scheme established by EdPA. Whether the State Supreme Court or the Superior Court or the Trial Court properly applied its own law or not is completely irrelevant to the question presented before this Court. I didn't hear him saying that. I think what he's saying is that the sufficiency issue is looked to under state law, but the end result has to rise to an issue of federal constitutional law as clearly pronounced by the Supreme Court, and the state application of that insofar it accomplishes a due process violation or a violation of Jackson has to be an unreasonable application of clearly established federal law. But the law that's at issue here is the law of specific intent to kill. The law of which you have to prove to get a criminal conviction comes into it under the due process laws, but the substantive body of law has to be Pennsylvania law because it's a murder case. Your Honor, the Pennsylvania's law on the elements of the crimes at issue must be considered by this Court. Right, and that's why he's arguing. No, Your Honor, he said that Your Honor should invalidate his client's convictions because the state court didn't properly apply state evidentiary law. And what I submit to you is... Okay, I understand. If that's what he said, we'll clarify it. I think the record will reflect that. Okay. And that is not the standard. But you would agree that the state court... Forget it for a second. That complicates it. You would agree that for this case not to amount to a violation of the due process clause, the record has to be sufficient to establish his guilt beyond a reasonable doubt, and you get to that point after drawing all reasonable inferences in favor of the government's verdict winner. You would agree with that? Well... If the evidence of record doesn't show... You're saying we'll decide EDPA for him? For the second. Let's just think about it. Right. And if that's the situation, we can then get to EDPA. But let's go back to how you get specific intent to kill, as opposed to Johnson knowing that his buddy is going to tune this guy up, or rough him up, or possibly just go out with him while he shakes him down to get the money that he believes he's owed. How does this record get, beyond a reasonable doubt, the specific intent to kill? That's the concern. Okay. First of all... And you can put EDPA in there if you want to, but it's got to be something there to show specific intent to kill. But obviously, as this Court is well aware, your job is not to subjectively determine guilt or innocence based on the record. Your job is to determine whether the state court's determination that the evidence was sufficient. It's a reasonable application. It's a reasonable application of clearly established federal law as determined by the U.S. Supreme Court. And on that point, I need to... But we agree that Jackson gets this past that hurdle. Jackson is the standard this Court has to look at. Right. Not federal court of appeals interpretations of federal law, and not state law. Okay. Only the clearly established federal law as determined by the U.S. Supreme Court. Well, in Jackson, the Court said the Constitution prohibits the criminal conviction of any person except upon proof beyond a reasonable doubt. So we have to go to the elements of what the crime are. That gets us into state law. I'm not sure this is being really productive in terms of helping us get where we've got to go. But, Your Honor, the thing is, as my colleague stated, there's direct evidence, and then the Commonwealth or the prosecution is also asking this Court to apply the Jackson standard and credit all reasonable inferences that arise from the direct evidence that are favorable to the Commonwealth. And on that point, I'd like to get this right. I want to read you a quote from Jackson v. Virginia. This directly refutes... More about... Okay, it's on page 326 of the United States Reporter, U.S. Reporter. This directly, expressly refutes and rejects Mr. Wiseman's contention that when it comes to inferences, that this Court must look at whether or not there are innocent explanations or inferences that are indicative of innocence rather than guilt. Here's the language from the majority opinion. A federal habeas court faced with a record of historical facts that supports conflicting inferences must presume, even if it does not affirmatively appear in the record, that the trier of fact resolve any such conflicts in favor of the prosecution, and it must defer to that resolution. But you're talking about conflict. It's one thing if you've got conflicts. It's another thing if you've got evidence that simply doesn't point in any one direction. It points in several different directions. That's not a conflict. Your Honor, with all due respect, the Supreme Court said in Jackson, if a fact established by direct evidence is susceptible of more than one interpretation, and one of them, as long as it's reasonable, if it's favorable to the commonwealth, this court, the federal habeas court, must credit it when it's determining whether the state court's determination was reasonable.  That's where the point of divergence is right now. One thing I can tell you that reasonable does not mean is what my colleague is, my respected colleague says, which is he says, more likely than not. This is the test, Your Honors, more likely than not. Absolutely not, Your Honors. It's nowhere in Jackson, and it's nowhere in Jackson's progeny. And in fact, in the U.S. Supreme Court case from 1995, Schlupf v. Dello, the majority opinion stated, and now I have to, you know, full disclosure, that case dealt with... Degrees of guilt, not necessarily absolute innocence. It dealt, well, what happened in that case, the majority opinion compared the standard to be applied by the federal habeas court in a sufficiency case under Jackson with the standard to be applied when the issue is actual innocence. So it's not directly on point, but it talks about, the Supreme Court talks about its own standard in Jackson in 1995, which is a good 15 years later, and it says, it says that, explains that Jackson does not impose a probabilistic more likely than not test. It's black and white in that opinion, and unfortunately I didn't cite that in my brief, but it's 513 U.S. 298, Schlupf v. Dello. I found that in preparation for this argument, Your Honors, but it says it's not a probabilistic test. When did you find it? Your Honor, I found it yesterday when I was, as I was continuing my preparation. And do you have a cell phone? Do I have a cell phone? Yes, sir, I certainly do. Do you know what his number is, or can you find it? Probably in two seconds. I'm sorry, if it was, if the rules require me to call him on that, I... Well, it's basic courtesy. I mean, if you're going to argue a case that you know about before coming into it, you might give us... Well, I assume... It'd be nice to let us know, too, when you did in 28J letters, but you could have let us know about your alliance on Schlupf. It's a very prominent case that we're familiar with, but not for that one specific point. And it's usually cited for whether or not innocence means actual innocence of a crime, vis-à-vis degrees of guilt. So you're not guilty of first degree, but you're guilty of second degree, is that a claim of actual innocence. That's usually where it's cited. Yes, sir. Well... Do you have a page site? Because I agree with Judge McKay. I, Your Honors, I can take the time to find it right now. It's in my briefcase. Oh. Or I can submit it in a letter. You can send us a, do a 28J with it. Absolutely, Your Honor. And I apologize if I violate any rules. It was not my intention to do that. It was late, it was yesterday that I found that. But it says that, it explains that the Jackson Standard instructs the federal habeas court to simply ask whether, as a matter of law, given the evidence, view the light most favorable to the commonwealth, a rational jury had the power to convict. Not whether a rational jury should have convicted. They said, I can't believe the court said, had the power to convict. They have the power to convict on no evidence. They have the power to convict based on total bias. Well, Your Honor, they used the word had the power because I found it sort of perplexing. I agree with you. I think what the court means by that is, did they have the ability, they're trying to draw a distinction in terms of the deference that this federal habeas court must show to the state court determinations and say, the question isn't for this court. Look at the record, view the light most favorable to the commonwealth. Should it have convicted? Could it have convicted? And that's essentially what Jackson says. I'm not sure there's any disagreement between you, Mr. Weisman. He's arguing that they should not have based upon this evidence. But he's saying because if you take each inference that the commonwealth believes is a reasonable inference, it should be credited by this court when it does its analysis. He's saying that take each one, break it down. Why is that a reasonable inference? Why is it a reasonable inference? Two guys ride on an alley and a dead is owed to one of those two. Why is it reasonable to assume from that that the other person to whom that's not owed has specific intent to kill the dead? Or why is that a reasonable inference? Okay. The testimony was from Victoria Dobbs and I witness. She said, I may not have it exactly, but it's in the brief and it's in the record, was that Walker, the co-defendant, the shooter, Walker walked up to the victim and asked him, walked up to the victim and talked to him about the money he owed to us. And then she said also, he said to them, Walker said to the victim, hey, what's up with the money that you owe to us? Something to that effect. It's the word us, okay? Now, what do we do with the deference? The state court found that, I think the superior court also picked up the language, that it was a debt owed to Walker. Is there any deference owed to that finding? Okay. I do not believe this. I could be wrong. I do not believe the superior court made that finding. I believe that the state court in its opinion did make that statement. However, I want to draw your attention. What's the difference between a statement and a court opinion and a finding? No, in other words, made that finding, yes. Let me just say this. To the extent that that state court finding is presumption of correctness, I would submit that if you look at the record, the evidence is clear and convincing that that was incorrect because as my colleague points out in his reply brief, she says us, then she says it's owed to him. She uses the terms him and us interchangeably. Well, why couldn't it be owed to Walker? The logical conclusion of that is it's owed to Walker and Brown. Where does the us get Williams into it or Johnson into it? The reason, as pointed out by Judge Jones in the district court, because Dobbs' testimony, the woman who gave these two statements, using the word us, not him, okay, was her testimony was about the mourning in question and about the collective experience of the three of them, her, Walker, and the defendant. We woke up in the same house. We got up together. We walked to the Kentucky Fried Chicken. We stood there and saw that it's the victim. It's we, we, we. It's the three of them. So it's reasonable to infer that when she says us, she means us, all three of us. That's who she's been talking about throughout her testimony in the trial. The other thing is that for the state court to say the debt was owed to Walker, that's not inconsistent with the fact that the testimony was owed to both or all three of them. Right. So that's my response to that question, Your Honor. I would like to, so as I just want to stress, that the Supreme Court has rejected both the comparative analysis test for inferences that Mr. Wiseman proposes, you know, that, hey, if there's two inferences, you've got to weigh in, you've got to see which one's more persuasive. That's directly been rejected. And the same for this more likely than not. I think if you look, again, at the decision in Slough, you'll see that. And I will file a letter for instruction of the court pointing out exactly where that is. I would also point out that the more likely than not test has never been adopted. It's not in Jackson. It's never been adopted by any of its progeny. It's not clearly established federal law as determined by the U.S. Supreme Court. You have to apply, with all due respect, that law, not the Pennsylvania State's statement of what evidentiary law is or how sufficiency is determined. That's not in there. You know, to the extent that the U.S. Supreme Court has stated that, in the context of criminal statutory presumptions, that the presumption has to more likely than not arise from facts proven, that is not clearly established federal law governing sufficiency of analysis, you know, state court determinations in a habeas context. So that's my response to the citation to Leary. What about Everett? You cite Everett twice, and I was perplexed as to why, because I thought it's a case that Mr. Weissman would be citing to us. I'm sorry, which case? Weissman. It goes to the specific intent to kill again. It's a case where the issue was complicated by habeas, of course, but the issue was the trial counsel's ineffective assistance for not objecting to a jury verdict, which totally muddled the vicarious liability on specific intent for first-degree murder. And you cited it, I think it's page 22 on page 34 of your brief. I'm not quite sure what it's cited for. Was it Everett you said? Everett. Your Honor, I honestly do not recall. I would assume that I cited it for the legal proposition rather than for specific facts. I don't recall. Okay. I'm sorry. Can I ask you a question? You dropped this 28-JA letter on us yesterday, and you cite two Supreme Court cases or ones that are about to be argued. Are you suggesting that we hold this case? Your Honor, I simply wanted the court to be aware as soon as I discovered it, and I didn't realize it until the day that I wrote the letter, that I wanted the court to be aware that the U.S. Supreme Court has granted cert in a case where it has said it will review the appropriate standard of review to be applied by a federal habeas court under Jackson. And as I think I stated in my letter, I'm not asserting aggressively, you know, you must hold this, wait to dispose of this case. But I thought it may make some sense for the court to withhold any decision until we see whether the Supreme Court decides to extend or revise or clarify its standard of review as set forth in Jackson. If it were a civil case, that would be one thing. But if you're talking about a case where someone's liberty is at stake, even though he's already been in for 15 years, if you're wrong, and I'm not suggesting you are, but if you're wrong, if we were to agree that you were wrong, it does seem like a bit of a stretch to ask somebody to continue to sit in a prison for four months while we await the outcome of the case. You can easily ask us to withdraw the mandate. If we were to rule against it, we're not suggesting that we would, and it turns out that we're wrong. I wouldn't disagree with that. I would also say that, you know, obviously if the Supreme Court were to, and we have no idea if they were to issue an entirely different standard, which is probably unlikely to be completely different, but it may substantively change the standard, and that may raise issues for the court in this case, depending on how they come down. So obviously I defer to the court on your decision on that, but I wanted you to at least be aware of it. I see my time's up. Let me walk through this again. You were saying, because I'm not quite sure where we are in terms of the standard that's applied. If we have a case where it looks as though it's total conjecture, there's some evidence that suggests that A was angry at B. There's evidence that, let's assume A and B are buddies and they're both angry at C, and A is clearly the killer. And you're saying if evidence is there to suggest that B knows of A's anger, maybe he's also angry at C, and A and B walk with C to a particular point, and A thereafter kills C, that a jury can confer from that under whatever standard applies that B had the specific intent to kill C, despite Fields and despite McFadden, which I think you're saying we shouldn't even look at. You should not look at – well, you should look at state law only to the extent that it elucidates what the state law is on the elements of the offense. But I would say that what you've just proposed to me – no, that's not what the appellees are arguing. What we're arguing is that the state court's determination that the evidence was sufficient for guilt on the two counts was not on a reasonable application of a clearly established federal law because of the facts you just articulated plus others, namely that the – B would threaten to kill C and that A owes money to C. He announces his intention the morning of two times. I'm going to kill him. Well, let's assume – back up a second. Let's assume and we clearly assume Johnson knows that Walker wants to kill Williams. Is that enough to say that Walker – that Johnson intends to kill – and that's the gap, and we see it all the time with juries, and the problem is going to be the standards and level of deference, and it's going to really complicate things. But is that – if I know A is going to kill B, and let's assume that I'm not going to be saddened by the fact that A is going to kill B, and A goes and kills B, that doesn't mean that I wanted to kill B. It means I'm not that upset that A killed B. But you're looking at one fact, what I would suggest that the court do, which is what the court did in Jackson when they were determining whether there was enough – whether it was sufficient evidence to support the intent to kill using the correct standard. I suggest you look at all the evidence, which is set forth in my brief comprehensively, but you've got not just that he heard him say he was going to kill him, not just that his close friend that he runs the streets with gets publicly humiliated, beaten with a broomstick. Johnson was also laughing at his close friend for having been beaten and humiliated. Wasn't Johnson also laughing at his close friend for having been humiliated? That's going to be my knowledge. It's other people on the street. And what's interesting is Mr. Wiseman wants you to do a balancing test. He wants the court to basically impose miniature burdens of proof on every inference the court could potentially consider as capable to come along, which is not in the clearly established federal law governing the Jackson review. But yet he also asked the court at the same time, ironically, to just make the inference that the people were laughing because they didn't take it seriously. They didn't take him seriously. He wanted to kill them. He didn't take them seriously. They were just laughing. They were laughing. Yeah, but you don't have to go that far. They were laughing for whatever reason. Let's assume that they were laughing at it. It doesn't matter. His close friend was humiliated. Did the victim who humiliated and beat his close friend refuse to pay a debt owed to us? And I'm asking the court to make that inference. And the question isn't whether you think the inference could be made. It's whether a rational, any rational juror could have made that inference. That's the clear thing. It's not what this court thinks. It's what any rational juror could have done. The other thing is, Your Honors, there was an argument in the bar that night. The defendant was so involved that he got thrown out too. The jury heard he was thrown out. That's testified to by two different eyewitnesses. He got thrown out along with the victim and the shooter. They go down and there's— Believe me, we're aware of all those things. The issue comes down to specific intent. Yes. I'm not sure if you've tried many homicides or any, but you get into these situations where a fine line comes up between whether or not somebody really intended, again, to use the phrase, to tune someone up or to really hurt them vis-a-vis had the specific intent to kill. It's a very narrow, very precise, thin laser that has to be shot to get that. And it's very easy to muddy that and just say there was animosity. Animosity is not enough. May I respond to that? Sure. Respectfully, we're not saying it's just animosity or some vague sense of alliance because they're friends. I mean, what we haven't talked about at all this morning is the other evidence, that after they're thrown out of the bar, the three of them, that they walk single file. Two people testify. They walk single file with the victim sandwiched between the shooter and the defendant. They walk single file with him between them. Then two witnesses testify. One says— He was forced in and one said— One says they forced him in. No, they walked him in is what one says. The other says he was definitely—he was forced into that alley. And the testimony is clear. There's no dispute on this. First goes the shooter into the alley. Then goes the victim. And then goes the defendant with the knowledge of what happened 12 hours before, however many hours it is. You know, with all that in the background, he stands at the entrance, blocking any exit. Within seconds, boom. And then what happens? Does he stay there till the police get there? Well, please don't use that argument. Does he stay there? Why in the world would he stay there till the police come? The fact that he runs— If he wasn't a conspirator or an accomplice, why would he— Because he was somebody who just shot somebody. Well, but you've got a lot stronger arguments than the fact that he ran. No, but that's—let me say one more thing if I may. There's also the evidence not only that he ran after the shooting— And he paid someone for an alibi. He paid—he had a friend offer—successfully offer Dobbs bail money to get her out of jail if she would give a false alibi, which she initially did for the defendant. And you've got the jury hearing that when detectives— Mr. Sargas, we do understand all that. This comes down to, again, not animosity, malice, but specific intent to kill. I'm not sure we're getting very far. It's whether a rational jury hearing, all of that evidence could have found accomplice viability. Assuming that we can get to Fields and McFadden, maybe we can't. I don't know. What's your view of what the Supreme Court of Pennsylvania did in those two cases? Were they just wrong? Is that with regard to the more likely than not— Specific intent to kill. Oh. You've got a set of very suspicious circumstances that the defendant is involved in a fatal killing, but not the actual shooter, and whether or not the involvement is so great that it establishes beyond a reasonable doubt specific intent to kill, that in Fields and McFadden, the Pennsylvania Supreme Court, not known for being a bastion of liberalism, said it's not here. Your Honor, with all due respect, sincerely, for this court to be asking whether the state court's determination that the evidence was sufficient for Mr. Johnson, that that was somehow inconsistent with prior determinations of the Pennsylvania Supreme Court, that is completely improper under AEDPA. Well, I said notwithstanding the standard. I know there may be a problem with the standard. If Your Honors were to go there, it would, with all due respect, be improper. What if the Supreme Court decides in three or four months that you have to go there, that that's an inappropriate inquiry? Rather than having us send you out a request for a 28-day letter, why not just answer the inquiry now? Save us some time. I would say this, that I didn't focus— I don't recall the specific facts of McFadden and the other case with a great deal of detail at the moment. They're incredibly short opinions. I can read them to you. They're two or three page opinions. Your Honor, again, each sufficiency evidence case is fact-specific. And I do believe that Pennsylvania law—I think it's more important to focus on the fact that under Pennsylvania law, specific intent to kill can be formed instantaneously, just a split second before the shooting. So this argument that he didn't have—I just think that the law is clear. I don't think there's any question that the state court determination that the evidence was sufficient in this case was a reasonable application of Jackson v. Virginia, because any rational juror could have found guilt proven beyond a reasonable doubt, given the state law. And the question is, could any rational juror find it? Not could this court find it or would this court find it, whether any rational juror, given the state of the law and the substantive elements, could they have found guilt— Okay. Mr. Stoikos, thank you very much. You'll be reserved a few minutes, I think, Mr. Weisman. Thank you, Your Honor. Thank you. Mr. Stoikos, of course, it was his prerogative, didn't accept my challenge to present to the court any particular fact, a series of facts, which, taken together even, did not have multiple innocent inferences. Let me address the question, because I think I may have overstated my position at some point in the litigation. My position is not that whenever a state court gets it wrong, it's an unreasonable application of Jackson, whenever it gets a sufficiency question wrong. However, my position is that when you apply the correct standards and all you're left with is speculation and surmise, that a state court's failure to apply Jackson and find speculation and surmise to be insufficient, that is always going to be an unreasonable application of Jackson. Just so I'm clear on that. Let me address this Jackson quote that Mr. Stoikos read, because I think it really is circular and begs the question. If you look earlier in Jackson, on page 319, it says, after reviewing the standard, this familiar standard gives full play to the responsibility of the trier of fact, failure to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences. The bottom line is this court is still left with the responsibility to determine what is a reasonable inference. The language later, which says you shouldn't try to resolve these conflicts, obviously doesn't mean that you are resolved of responsibility of determining what's a reasonable inference, that Jackson requires that. Now, Mr. Stoikos, I really don't understand. It's particularly interesting that an attorney general for a state would be arguing not to apply state law. I don't know what law you would then apply to the question of how do you evaluate the reasonableness of an inference. He's telling you apply federal law. Well, that just doesn't make sense. These are state evidentiary issues. This is a state sufficiency of the evidence claim viewed through the due process clause. I don't know what other law you would apply. And I would submit you're bound by the Jackson v. Byrd case, which is precedent in this circuit, to my knowledge has not been modified or overruled in any respect, which, by the way, denied relief to the petitioner, but which applied state law. That case was a question about whether the defendant had constructive possession of some contraband, and the opinion is all about inferences to be drawn under state law as to whether or not it was reasonable to infer that the defendant had constructive possession. This thing about the argument in the bar, I think I may explode if I don't say this. And I hope it's clear in my brief. Nobody heard what was said. For all we know, Mr. Johnson was saying, yo, chill out. You know, it's not a big deal that he owes you money. Or even if he owes me money, it's not a big deal. I don't care about this thing. Yeah, but Mrs. Turco's response to that is, yeah, the jury could have said that, but we have to assume that the jury heard that and read something more sinister into it. And you're saying that's sort of speculation. But that's speculation. Because it's based on multiple innocent inferences. Because then, even if you're assuming that, you know, something was said that he vinced specific intent to kill, that he, I'm sorry, that something was said that he vinced the specific intent to kill, and we just don't know that, that argument is of zero probative value. The money for the alibi question, again, requires a multiple number of inferences. I understand that. It's the same as the flight. It's the same as the flight, but it's even more removed because the testimony, as I recall, is that a friend of them paid me, you know, paid my bail so I would give an alibi. Now, you know, that's an inference then that Mr. Johnson put that person up to it, which he may or may not have, equally plausible inferences. And then, moreover, that that, even if he did it, that that would evince the specific intent to kill, just like all other flight evidence, it's weak evidence. One more word about the debt and then I'll stop. The finding of the state court is at page 603 of the appendix. Quote, Tahara Williams approached and Cory Walker indicated that he had to go and yell at Tahara about some money that Tahara owed Cory with a paid citation to the record. Close quote. Now, this was a- Was it the trial court or the superior court? This is the trial court, which the superior court adopted in the law. They recited it. This is a recitation of the findings made in reference to a sufficiency of the evidence claim. This is a finding. The debt was owed to Walker and not to Williams and not to them. That's the state court finding. Please give a deference. If you give a deference, here it is. You finally get to earn your deference. After all these years, you finally get to earn your deference. You know, but even if, even if you were to say the debt's owed to my client, you still have to make multiple leads. You still have to conclude that he was so angry about that debt he had a specific intent to kill. And where does that come from? There's nothing there. There's so many multiple- We do understand your argument. I hope you do. Okay. Thank you. Thank you. We'll take that under advisement. I want to thank the counsel for a very, very good and very helpful argument.